# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

---------------------------------------------

| | |
|---|---|
| ESTATE OF LIKO KENNEY | ) |
| PLAINTIFF | ) |
| | ) |
| VS. | ) |
| | ) |
| GREGORY WILLIS FLOYD; | ) |
| | ) |
| CHIEF MARK R. MONTMINY, | ) |
| IN HIS INDIVIDUAL AND | ) |
| CAPACITIES; | ) |
| | ) |
| SERGEANT MARK TAYLOR, | ) |
| IN HIS INDIVIDUAL AND | ) |
| OFFICIAL CAPACITIES; | ) |
| | ) |
| CORPORAL BRUCE MCKAY, | ) |
| IN HIS OFFICIAL CAPACITY; | ) |
| | ) |
| and | ) |
| | ) |
| TOWN OF FRANCONIA | ) |
| BOARD OF SELECTMEN | ) |
| | ) |
| DEFENDANTS | ) |

CASE NO.: 2010-CV-00181-PB

---------------------------------------------

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Estate of Liko Peter Kenney ("the Estate") has sued the Town of Franconia ("the Town"), Franconia Police Chief Mark Montminy ("the Chief" or "Chief Montminy") and Sergeant Mark Taylor ("Sergeant Taylor"), in both their official and individual capacities, and Corporal N. Bruce McKay ("Corporal McKay") in his official capacity, pursuant to 42 USC § 1983 and various state law theories.  The Estate claims that the defendants are responsible for

unlawful seizure and substantive due process violations, specifically, that Liko Kenney ("Kenney") was seized without probable cause and/or subject to a manner of detention that exceeded what was appropriate given the nature of the police-citizen contact.  Additionally, the Estate claims that Corporal McKay's direct supervisors at the Franconia Police Department, as well as Town officials, abrogated their responsibility to the public by willfully and negligently failing to investigate and discipline Corporal McKay for reported instances of inappropriate and unlawful conduct (Count I).

The Estate has also sued based on several state law theories claiming that the Town negligently hired Corporal McKay (Count II); the Town negligently retained and promoted Corporal McKay (Count III); the Town negligently trained and supervised Corporal McKay (Count IV); that Corporal McKay intentionally inflicted emotional distress upon Kenney and, finally that the other defendants negligently inflicted emotional distress on Liko Kenny (Count VI).  Count V is a claim against another defendant, Gregory Floyd, for wrongful death.  The Estate seeks compensatory and punitive damages.

On May 5, 2011, this Court granted the defendants' partial motion to dismiss to the extent that any claims are based on a January 26, 2003 interaction between Kenney and Corporal McKay.

The defendants are entitled to summary judgment in this matter because Liko Kenney was not deprived of any constitutional right, because Corporal McKay had probable cause to pursue and arrest Kenney on May 11, 2007, because Kenny's death was not caused by any actions of the Town defendants but instead was the result of his own actions, and because there is no evidence that the Town did not exercise the proper degree of training and supervision and hiring of its police officers in this matter.

**STATEMENT OF FACTS**

On May 11, 2007, Kenney shot and killed Franconia Police Corporal Bruce McKay after Corporal McKay had attempted to stop Kenney and his car for driving an unregistered vehicle. See Report of Attorney General, attached as Exhibit A, at p.22.  At approximately 6:00 p.m. on May 11, 2007, Kenney was driving home after working in Littleton, New Hampshire.  He had a passenger in the car named Caleb McCauley.  *Id* at p.8.  While on his way home, a Franconia Police cruiser saw them from the opposite direction, turned around, and turned its lights on and pulled Kenney over.  *Id* at p.20; see also, Statement of Susan Thompson, attached as Exhibit B. Corporal McKay approached the vehicle and asked Mr. Kenney for his driver's license and registration.  See Report of Attorney General at p.9.  After Mr. Kenney provided these, Corporal McKay went back to his cruiser.  As he was going back to his cruiser, Kenney fled the scene.  *Id* at p.20.  Corporal McKay pursued Kenney for about a mile.  After about a mile, Corporal McKay overtook Kenney's vehicle, turned his vehicle around and positioned his vehicle so that the nose of his vehicle was facing the nose of Kenney's car.  See Statement of Susan Thompson attached as Exhibit B.  Corporal McKay pushed Kenney's vehicle into a driveway toward a caterpillar tractor so that Kenney could not drive away.  See Report of Attorney General, attached as Exhibit A at p.10.  Corporal McKay then left his vehicle, went up to the driver's window of Kenney's vehicle, and sprayed pepper spray into the vehicle in order to prevent him from fleeing again.  *Id* at p.10.  As he was walking away, Kenney fired several shots at Corporal McKay.  *Id*.  Corporal McKay was struck by four bullets and fell to the ground, mortally wounded.  Kenney then proceeded to drive his vehicle over Officer McKay twice.  *Id* at p.11.

Gregory Floyd was seated in his truck watching this incident.  Upon seeing what had happened, he got out of his truck, went over to Corporal McKay, and grabbed his service

weapon.  *Id.* at pp.9, 11.  He then went up to Kenney's car and shot Kenney twice, killing him. *Id.* at pp.1-2.  See also Am. Compl. at ¶¶ 4-7; 10-15.

Corporal McKay had, at the time of his death, been employed by the Franconia Police Department since 1995.  See Affidavit of Chief Montminy, attached as Exhibit C, at ¶2.  As a patrolman, Corporal McKay was supervised by Chief Montminy and Sergeant Taylor.  *Id* at ¶3.; see also Affidavit of Sergeant Taylor, attached as Exhibit D.  Of the complaints or incidents referenced in the amended complaint, Chief Montminy or Sergeant Taylor were aware of all of them.  See Affidavit of Chief Montminy, attached as Exhibit C at Part IV.

Each of the officers hired by the Franconia Police Department goes through the New Hampshire Police Academy where they receive extensive training.  *Id* at Part II.  Once at the Franconia Police Department, Chief Montminy supervises each officer.  *Id* at ¶3.  Each officer attends training during the course of their service years at the Franconia Police Department.  *Id* at ¶5.  Corporal McKay was no exception to this.  During his first few years with the department, he received complaints from citizens, which is not unusual.  *Id* at Part IV.  Chief Montminy addressed those complaints and counseled McKay regarding some of those complaints.  *Id.* Many of the complaints were unfounded, but Chief Montminy did address certain complaints with Corporal McKay as needed.  *Id.*

The Estate, in its amended complaint, refers to several incidents as to which it believes the Town and the Police Department failed to properly supervise Corporal McKay.  In paragraph 17, the Estate refers to a complaint made by the wife of a local police officer that suggested that Corporal McKay was a dangerous individual and that he had displayed a knife toward her in a threatening manner during an interaction.  Chief Montminy received this complaint, investigated it, and determined that the complaint was unfounded.  He determined that the actions of Corporal

McKay in using a knife to cut off a seatbelt because the complainant refused to unbuckle it were justified under the circumstances.

At paragraph 18 of the amended complaint, the Estate refers to an individual named Timothy Stephenson, who filed a lawsuit against Corporal McKay in which he alleged that Corporal McKay had threatened him by touching the butt of his service pistol during a police-citizen interaction.  (Actually, it was a canister of pepper spray that Corporal McKay touched.)  Chief Montminy investigated the incident and determined that there was no basis for the complaint.  Moreover, Mr. Stephenson withdrew his suit against Corporal McKay.  *Id* at ¶19.

At paragraph 19 of the amended complaint, the Estate states that Chief Whitcomb of the Franconia Fire Department complained that a firefighter had been threatened by Corporal McKay.  Again, Chief Montminy investigated this incident and determined that the incident did not rise to the level of a threat and again counseled Corporal McKay regarding it.  *Id* at ¶20.

The three incidents mentioned in the amended complaint all occurred in the late 1990s or early 2000s – several years before this incident.  As a result of the ongoing training and supervision of Chief Montminy, Corporal McKay was promoted and had a very good record with the Franconia Police Department until his death.  *Id* at ¶¶21, 24, 26.

At paragraph 20 of the complaint, the Estate states that Corporal McKay had a domestic violence protective order filed against him by his ex-wife.  The relevance of this matter is questionable.  Moreover, his ex-wife requested that the protective order be withdrawn, and it was.  *Id* at ¶22.  <u>See</u> Withdrawal Order, attached as Exhibit E.

At paragraph 21 of the amended complaint, the Estate states that Corporal McKay resided in Lisbon, New Hampshire and was ordered by the Lisbon Police to stop using their police radio frequency and to stop issuing traffic tickets in their town.  Again, Chief Montminy was aware of

the situation and counseled Corporal McKay regarding the issues surrounding this allegation. See Affidavit of Chief Montminy, attached as Exhibit C at ¶23.   This again demonstrates that Chief Montminy was properly supervising Corporal McKay.

At paragraph 22 of the amended complaint, the Estate alleges that Corporal McKay was involved in a confrontation between two young males at the Profile High School.  Plaintiff complains that Corporal McKay discharged his OC spray and, as a consequence, a female student who suffers from asthma had an attack from breathing in the air and needed to be hospitalized.  Chief Montminy was aware of this, investigated it, and determined that Corporal McKay acted appropriately under the circumstances. *Id* at ¶24.

At paragraph 23 of the amended complaint, the Estate alleges that the behavior of Corporal McKay resulted in an executive session wherein the Town of Franconia selectmen had to consider whether to discipline the officer.  In fact, the selectmen largely left discipline of officers to the Chief because they were satisfied with his judgment and because it was his area of expertise.  However, the Chief did keep the selectmen apprised of personnel matters.  The Board of Selectmen were aware of the incidents involving Corporal McKay and were satisfied that Chief Montminy was appropriately supervising Corporal McKay.  *Id* at ¶25.

At paragraph 24 of the amended complaint, the Estate alleges that Sergeant Taylor was Corporal McKay's direct supervisor with the Franconia Police Department.  Sergeant Taylor did supervise Corporal McKay when the occasion warranted it.  See Affidavit of Mark Taylor, attached as Exhibit D.  Sergeant Taylor was aware of complaints made by Brad Whipple and his characterization of Corporal McKay as a "rogue" officer.  Sergeant Taylor appropriately supervised Corporal McKay, recommended discipline when he believed it was appropriate, and had no reason to believe that Corporal McKay would violate citizens' rights.  *Id.*

It should also be pointed out that in addition to complaints that were filed against Corporal McKay, (which, again, is not unusual), several commendations from citizens came in on behalf of Corporal McKay during his tenure with the Franconia Police Department.  <u>See</u> Affidavit of Chief Montminy, attached as Exhibit C at ¶28.

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc*., 477 US 242, 250 (1986).  A material fact is one that affects the outcome of the suit.  *Id.* at 248.

In deciding a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-movant.  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir. 2001).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact."  *Celetex* at 323.  Once the moving party has properly supported its motion, the burden shifts to the non-moving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  *Iyala-Gerena v. Bristol-Meyers – Squibb Company*, 95 F.3d 86, 94 (1st Cir. 1996).  While courts must

exercise restraint in granting summary judgment in cases where the non-moving party must

prove "elusive concepts such as motive or intent… summary judgment may be appropriate if the

non-moving party rests merely upon conclusory allegations, improbable inferences, and

unsupported speculation."  *Smith v. Stratus Computer, Inc.*, 40 F.3d 11-13 (1st Cir. 1994).

## ARGUMENT

### A.  Because Kenney Can Demonstrate no Violation of any Constitutional Right, his § 1983 Claims Fail as a Matter of Law.

To prove a claim under 42 USC § 1983 against an individual, a plaintiff must

demonstrate that he suffered a violation of a right secured by the constitution and laws of the

United States, and must show that the deprivation was committed by a person acting under color

of state law.  *West v. Atkins*, 487 US 42, 48 (1988).  To prevail under § 1983 against a

municipality, a plaintiff must also demonstrate that the municipality itself, through the

implementation of municipal policy or custom, caused the underlying constitutional violation.

*Monell v. Department of Social Services*, 436 US 658 (1978).  Thus, the proper analysis requires

a separation of two issues: "(1) whether plaintiff's harm was caused by a constitutional violation

and (2) if so, whether the city is responsible for that violation."  *Collins v. City of Harker

Heights,* 503 US 115, 120 (1992).  In general, a municipality cannot be held liable where its

employees did not commit an underlying constitutional violation.  *City of Los Angeles v. Heller*,

475 US 796 (1986).

Here, because Kenney suffered no constitutional deprivation, his §1983 claims fail at the

outset as a matter of law.

### (1)  The Initial Stop

As stated above, Corporal McKay stopped Kenney initially because he observed him

driving a car with an expired registration.  Interpreting the Fourth Amendment's proscription on

unreasonable searches and seizures, the courts have generally held that a police officer may make a traffic stop on less than probable cause. <u>See</u>, <u>e.g.</u>, *Glover v. Casale*, 2000 WL 33667082 *1, n. 3 (D.N.H. 2000). Specifically, the officer effecting the seizure must have a "reasonable suspicion that a traffic violation has occurred." *United States v. Chaney*, 584 F.3d 20, 25 (1st Cir. 2009) <u>cert.</u> <u>denied</u>, 130 S. Ct. 1557 (U.S. 2010).

Here, Corporal McKay observed Kenney driving a car with an expired registration. This is a violation under New Hampshire law. <u>See</u> RSA 261:40; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>U.S. v. Smith</u>, 148 F. App'x 615 (9th Cir. 2005) (holding that driving with an expired registration gives rise to probable cause). Hence, Corporal McKay had much more than the reasonable suspicion required for him to stop Kenney's vehicle because he personally observed the prohibited act contemporaneously with its commission. Therefore, his initial stop of Kenney was justified.

### (2) The Pursuit, Vehicle Maneuvers, and Pepper-Spraying

As detailed above, Kenney drove away as Corporal McKay was returning to his cruiser in order to check Kenney's license and registration. Under RSA 265:4, a motorist shall not:

> Purposely neglect to stop when signaled to stop by any law enforcement officer who is in uniform or who displays his badge conspicuously on the outside of his outer coat or garment, or who signals such person to stop by means of any authorized audible or visual emergency warning signals; or otherwise willfully attempt to elude pursuit by a law enforcement officer by increasing speed, extinguishing headlamps while still in motion or abandoning a vehicle while being pursued.

Under RSA 265:4, then, Kenney's act of fleeing during a traffic stop was illegal, and because Corporal McKay personally witnessed the prohibited act contemporaneously with its commission, there was probable cause to believe that a crime had or was occurring. Therefore, even assuming that the initial stop was unjustified, probable cause arose independently when Kenney fled the scene of a traffic stop.

As to the lawfulness of McKay's pursuit, attempts to apprehend, and pepper spraying of Kenney, the Courts have frequently recognized these techniques as legitimate law enforcement tools, even though they constitute the application of force.  In *Graham v. Connor*, for instance, the U.S. Supreme Court stated:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

490 U.S. 386, 396-97 (1989) (citations and quotation omitted).  The standard to be applied to Corporal McKay's conduct, then, affords him the deference he needs to make split-second decisions in the field.

Here, the reasonableness of Corporal McKay's actions depends upon whether the force he applied was justified in light of the risk posed by Kenney's conduct.  See *Scott v. Harris*, 550 U.S. 372, 383 (2007).  The courts have recognized the significant risk posed by suspects fleeing in cars.  See, e.g., *Lytle v. Bexar County*, 560 F.3d 404, 415 (11th Cir. 2009) ("Nearly any suspect fleeing in a motor vehicle poses some threat to the public.")  Additionally, they have recognized that, even where the suspect is stopped for a minor infraction, the act of fleeing from the police transforms the police-citizen encounter into something much more serious.  *Scott*, 550 U.S. at 393 (Stevens, J., dissenting) ("I recognize, of course, that even though respondent's original speeding violation on a four-lane highway was rather ordinary, his refusal to stop and subsequent flight was a serious offense that merited severe punishment."); see also *Graham*, 490 U.S. at 396

("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.")

The intrusion here was Corporal McKay's pursuit, his low-speed maneuvers in which he attempted to corner Kenney's vehicle so as to prevent further flight, and his application of pepper spray to Kenney.  Under *Scott*, Corporal McKay was not required to give up the chase in order to protect Kenney or the public.  See *Scott*, 550 U.S. at 385 ("But wait, says respondent: Couldn't the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best.").

Additionally, the application of pepper spray to an uncooperative, fleeing suspect is a legitimate technique reasonably tailored to the governmental objective.  See *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002).  ("Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital.  Furthermore, as a means of imposing force, pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury.  Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.") (quotations and citations omitted); see also *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003)

("Pepper spray is an especially noninvasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others. Shock and surprise may be proper and useful tools in avoiding unnecessary injury to everyone involved when dealing with potentially violent suspects. Given that pepper spray ordinarily

causes only temporary discomfort, it may be reasonably employed against potentially violent suspects, especially those suspects who have already assaulted another person and remain armed."). Finally, it bears emphasizing that there was no application of <u>deadly</u> force by Corporal McKay or by any other governmental actor.  <u>See</u> RSA 627:5 ("A law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention or to prevent the escape from custody of an arrested or detained person, unless he knows that the arrest or detention is illegal, or to defend himself or a third person from what he reasonably believes  to be the imminent use of non-deadly force encountered while attempting to effect such an arrest or detention or while seeking to prevent such an escape.")

For these reasons, Kenney cannot demonstrate that he was subject to any constitutional deprivation.  Therefore, his claims under §1983 necessarily fail.

## B. <u>Federal Claims Against Chief Montminy, Sergeant Taylor and the Town of Franconia</u>

Even if the Estate were to show that Kenney suffered some constitutional violation, however, the Estate faces a significant hurdle: There is no *respondeat superior* liability in §1983 claims.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).  Therefore, in seeking to show that Chief Montminy, Sergeant Taylor, and the Town are liable under §1983 for failing to properly train, supervise, and discipline Corporal McKay, the Estate must show that their "conduct or . . . action amounts to 'reckless or callous indifference' of [Kenney's] constitutional rights and that an 'affirmative link' existed between the constitutional violation and their acts or omissions." *Miller v. Kennebunk County*, 219 F.3d 8, 13 (1st Cir. 2000).  To meet the indifference element for supervisory liability, the Estate must show "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to

address the risk." *Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 279 (1st Cir. 2000).  Mere

negligence is insufficient for a supervisory liability claim.  *Maldonado-Denis v. Castillo-*

*Rodriguez*, 23 F. 3d 576, 582 (1st Cir. 1994).

        The record facts in this case show that both Chief Montminy and Sergeant Taylor <u>did</u>

"take easily available measures to address" any risk Corporal McKay might have posed.  They

met on several occasions with Corporal McKay when he first became an officer in the Franconia

Police Department.  Based upon complaints they had received about his performance of his

duties, on some occasions, both Chief Montminy and Sergeant Taylor counseled him and took

corrective action.  As a result of this supervision, Corporal McKay performed his duties well and

was promoted.  In the few years prior to 2007, Corporal McKay had very few complaints against

him for the performance of his duties.  Clearly, the counseling and corrective actions that Chief

Montminy and Sergeant Taylor undertook early in Corporal McKay's career had a positive effect

on his performance.

        Additionally, the record shows that Corporal McKay went through the New Hampshire

Police Standards and Training Academy to become a full-time police officer.  Corporal McKay

received in-service training while employed by the Franconia Police Department.  Moreover,

there is no evidence to suggest a widespread problem with the way that officers in the Franconia

Police Department handle arrests.  Corporal McKay's allegedly unsatisfactory conduct on this

and previous occasions will not sustain a claim against the municipality because "the fact that a

particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the

city, for the officer's shortcomings may have resulted from factors other than a faulty training

program." *Rodriguez-Vazques v. Cintron-Rodridgues*, 160 F. Supp. 2d 204, 212 (D.P.R 2001)

(quoting <u>Canton</u>, 489 US at 390-91).

C. **Even Assuming that Corporal McKay was not Justified in Stopping Kenney, Kenney's Commission of Capital Murder Extinguished any Liability that might otherwise have attached to the Defendants.**

Kenney's commission of capital murder extinguishes any liability on the part of the Town, Chief Montminy and Sergeant Taylor.  See RSA 630:1, I(a).  In *Bodine v. Warwick*, 72 F.3d 393, 400 (3rd Cir. 1995), the court, (Alito, J.), stated that even when police action preceding the alleged excessive use of force was unlawful, "under basic principals of tort law, [ ] the troopers would be liable for the harm 'proximately' or 'legally' caused by their tortuous conduct … not … for all the harm caused in the … but – for sense." *Id.*  The court also noted that the officers would not be liable for harm produced by a "superseding cause." *Id.*  The court used a hypothetical to illustrate this principle.

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent force unlawful?  The obvious answer is "no".

*Bodine*, 72 F.3d at 400.  Kenney's conduct constitutes a "superseding" cause, see Restatement (Second) of Torts, 442 (1965), that would limit the officer's liability. *Id.* at 400.

Here, although there is no evidence that Corporal McKay violated any of Kenney's constitutional rights, it does not follow that all of the subsequent damages were proximately caused by that alleged violation.  Kenney's act of murdering Corporal McKay extinguishes any possible liability that the Town of Franconia or its police officers might otherwise have borne. *Cf. State v. Panarello*, 157 N.H. 204, 208 (2008) (declining to apply the exclusionary rule and observing that, although the police entered the suspect's home illegally, "[T]he limited objective

of the exclusory rule is to deter unlawful police conduct [,] <u>not to provide citizens with a</u>
<u>shield so as to afford an unfettered right to threaten or harm police officers in response to the</u>
<u>illegality.</u>") (emphasis added).  As the New Hampshire Supreme Court has recognized,
individuals ordinarily are not subjected to liability for the criminal acts of third parties because
such individuals are entitled to presume that everyone will obey the law.  *Remsberg v.*
*Docusearch*, 149 NH 148, 154 (2003).  This is certainly so where an action is filed to seek
damages by the individual who committed the criminal act.

**E.  <u>State Law Negligence Claims</u>**

The Estate also alleges that the Town of Franconia, Chief Montminy and Sergeant
Taylor, in their individual and official capacities, breached their duty to train and supervise
Corporal McKay.  The Town of Franconia and its officers acting within the scope of their
employment are entitled to discretionary function immunity under New Hampshire law.
Accordingly, the Estate's state law negligence claims are barred.

In New Hampshire, municipalities are immune from liability for "acts and omissions that
constitute 'the exercise of an executive or planning function involving the making of a basic
policy decision which is characterized by the exercise of a high-degree of official judgment or
discretion."  *Hacking v. Belmont*, 143 NH 546, 549 (1999) (quoting *Merrill v. Manchester*, 114
NH 722, 729 (1974)).  Decisions about training and supervision of police officers involve a high-
degree of discretion, and, accordingly, the Town of Franconia, Chief Montminy and Sergeant
Taylor are entitled to immunity from liability under New Hampshire's doctrine of discretionary
function immunity.  *Brodeur v. Claremont School Dist.*, 626 F. Supp.2d 195, 223 (D.N.H. 2009)
("the New Hampshire Supreme Court would, like almost every other court to consider the issue,
that discretionary function immunity shields personnel decisions such as firing, firing, retention

and discipline.").  Therefore, and for the reasons stated above, the Town, Chief Montminy and Sergeant Taylor are entitled to summary judgment on these claims.

### F.  Infliction of Emotional Distress Claims

In Count VI,  the Estate claims "[t]hat all named Defendants should be held jointly and severally liable for the Intentional (McKay) and Negligent (All others) infliction of Emotional Distress upon "Kenney" through a pattern and practice of conduct toward him that shocks the conscience of prudent persons."

### (1) Intentional Inflication of Emotional Distress

To state a claim for intentional inflication of emotional distress under New Hampshire law, a plaintiff bears a heavy burden.  He "must allege that a defendant by extreme and outrageous conduct, intentionally or recklessly cause[d] severe emotional distress to another.  In determining whether conduct is extreme and outrageous, it is not enough that a person has acted with an intent which is tortuous or even criminal, or that he has intended to inflict motional distress, or even that his conduct has been characterized by malice.  Rather, [l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Tessier v. Rockefeller*, 2011 WL 4133840 (N.H. Sept. 15, 2011) (citations and quotations omitted).

Here, Corporal McKay was employed as a police officer for the Town of Franconia.  It was his job to patrol the town and enforce state law.  As detailed above, Corporal McKay's actions were legally justified at their inception and throughout the encounter.  But even assuming, as the Estate must, that his actions were not legally justified, there are absolutely no facts that would give rise to a cause of action for intentional inflication of emotional distress.  The

16

Estate's burden in this regard is especially hefty for several reasons.  Firstly, in assessing the propriety of Corporal McKay's actions, only objective factors are relevant.  Therefore, even if the stop was motivated by Corporal McKay's animus toward Kenney (as the Estate vaguely contends), Corporal McKay's otherwise lawful actions are not transformed into constitutional violations.  *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  [I]n analyzing the reasonableness of a particular search or seizure, it is imperative that the facts be judged against an objective standard.  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.") (citations and quotation omitted).

Secondly, even assuming, somehow, that Corporal McKay was not legally justified in stopping Kenney, in pursuing him, and in pepper spraying him, it would not follow that that he intentionally inflicted emotional distress upon Kenney.  Corporal McKay was well within the scope of activities that police officers are expected to perform.  Police officers pull cars over, enforce traffic laws, pursue suspects, and subdue them all the time.  See *Daigle v. City of Portsmouth*, 129 NH 561, 579-82 (1987).  Therefore, even if it was wrongful for Corporal McKay to pull Kenney over, pursue him, and use force in attempting to subdue him, these actions were not "beyond all possible bounds of decency."  The misguided attempt of a police officer to enforce the law.  See, e.g., *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1123 (N.D.

Ill. 1997) ("In situations involving unlawful arrests or excessive force by police officers, there

must be more than just a lack of probable cause or some excessive force.").

### (2) Negligent Infliction of Emotional Distress

Similarly, the standard for a finding of negligent infliction of emotional distress is not a

low one.  As the New Hampshire Supreme Court put it, "The elements of a claim for negligent

infliction of emotional distress include: "(1) causal negligence of the defendant; (2)

foreseeability; and (3) serious mental and emotional harm accompanied by objective physical

symptoms." *Tessier v. Rockefeller,* 2011 WL 4133840 (NH Sept. 15, 2011).

There are serious problems with this claim.  Firstly, the Town, Chief Montminy, and

Sergeant Taylor likely enjoy discretionary function immunity as to "acts and omissions that

constitute 'the exercise of an executive or planning function involving the making of a basic

policy decision which is characterized by the exercise of a high-degree of official judgment or

discretion." See Part E, above.  Therefore, the Estate cannot establish negligence on the part of

the defendants, let alone causal negligence.  Secondly, the Estate has presented absolutely no

evidence that the training, supervision, and discipline procedures employed by the defendants did

not conform to professional standards.  See *Gonzalez-Perez v. Davila*, 680 F. Supp. 2d 347, 354

(D.P.R. 2009) ("Without any independent evidence of an inferior training program, it cannot be

concluded that there was inadequate training.").  Finally, there can be no negligent infliction of

emotional distress without physical manifestations deriving from the mental distress.  *Palmer v.*

*Nan King Rest., Inc.*, 147 NH 681, 684 (2002).  ("Therefore, regardless of physical impact, in

order to recover for emotional distress under a traditional negligence theory, the plaintiff must

demonstrate physical symptoms of her distress.").  Here, even if Kenney suffered mental distress

as a result of Corporal McKay's conduct, he did not exhibit any physical symptoms of such

distress.  Such symptoms might have developed, as they often do, over time.  However, Kenney's commission of capital murder and his subsequent death foreclosed the possibility of him documenting any physical symptoms deriving from Corporal McKay's stop, pursuit, and pepper spraying.

## **<u>CONCLUSION</u>**

For these reasons, the Town of Franconia, Chief Mark Montminy, Sergeant Mark Taylor and Corporal Bruce McKay are entitled to summary judgment.

Respectfully submitted,

**TOWN OF FRANCONIA BOARD OF
SELECTMEN
CHIEF MARK MONTMINY
SERGEANT MARK TAYLOR**

By their Attorneys

RANSMEIER & SPELLMAN
PROFESSIONAL CORPORATION

Dated:   November 15, 2011          By:     */s/ Daniel J. Mullen, Esq.*
Daniel J. Mullen, Esq. (#1830)
Michael J. Malaguti, Esq. (#20355)
Ransmeier & Spellman, PC
One Capitol Street, P.O. Box 600
Concord, NH  03302-0600
dmullen@ranspell.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was forwarded to all counsel of record via ECF and via first class mail to Gregory Floyd at the NH State Prison for Men – TWC, PO Box 14, Concord, NH 03302


Date:   November 15, 2011                                    */s/ Daniel J. Mullen*
                                                           Daniel J. Mullen