# EXHIBIT A

**ATTORNEY GENERAL**
**DEPARTMENT OF JUSTICE**

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

KELLY A. AYOTTE
ATTORNEY GENERAL



ORVILLE B. FITCH, II
DEPUTY ATTORRNEY GENERAL

June 25, 2007

## REPORT OF THE ATTORNEY GENERAL CONCERNING THE DEATHS OF FRANCONIA POLICE CORPORAL BRUCE MCKAY AND LIKO KENNEY ON MAY 11, 2007, IN FRANCONIA, NEW HAMPSHIRE

### I.    INTRODUCTION

The Office of the Attorney General and the New Hampshire State Police conducted an investigation into Liko Kenney's May 11, 2007 shooting and vehicular assault of Franconia Police Corporal Bruce McKay, and Gregory W. Floyd's use of deadly force against Liko Kenney, which resulted in Kenney's death.

The purpose of this report is to summarize the Attorney General's findings and conclusions with regard to the incident. The findings and conclusions contained in this report are based on information gathered during the investigation, including autopsy reports, information provided from investigators, court records, diagrams, forensic testing, interview reports, photographs, police investigative reports, radio transmissions, recordings and transcripts of witness interviews and video recordings.

Based on the investigation's findings, and for the reasons detailed below, the Attorney General concludes that Liko Kenney killed Franconia Police Corporal Bruce McKay on May 11, 2007, by shooting him four times and then twice striking him with his car.  Gregory W. Floyd witnessed Liko Kenney's unlawful actions against Cpl. McKay and responded to the threat of imminent deadly force from Kenney by shooting him twice and killing Kenney.  Accordingly, the Attorney General has concluded that Gregory W. Floyd's use of deadly force was lawfully justified pursuant to RSA 627:4, II(a).

## II.   FACTUAL FINDINGS

### A.   <u>Witnesses to the Shootings</u>

State Police investigators talked to several witnesses to the incident.  Those witness interviews are summarized below:

**1. Rebecca T. Bell** gave a statement on May 11, 2007, and was interviewed later by the State Police.  Bell stated the following:  That she was in the kitchen of her parents' home at 2165 Easton Road in Franconia on the evening of May 11, 2007, when she heard sirens approaching and moved to a window where she could see Easton Road.  From there she saw a Franconia police officer pull over a small gray "sports car," which had been traveling south and had not yielded to the officer's vehicle.  After the officer pulled in front of the sports car and forced it to stop, the officer turned his cruiser around to face the car and tried to force it back down the slight incline they were on.  At that point, she walked outside and was standing by the edge of the barn, which was attached to her house.  She saw the driver of the sports car start waving his hand out the window and said

2

it sounded as though there was yelling but she was too far away to tell for sure. The sports car backed into the space next to the barn and the officer bumped the front of the sports car backwards several times (she estimated that the sports car moved back ten to fifteen feet with each bump). During this incident, she believed she was "witnessing just a traffic stop" although the driver of the sports car was "acting aggressively." The officer came around behind his vehicle and the driver of the car stuck his arm out his window. She saw that the driver was holding a gun and then she heard several (more than two) shots fired. She lost sight of the officer and then saw him run across the street into her aunt and uncle's yard (at 2190 Easton Road).

She also saw a black or dark gray pickup truck traveling south and saw that the truck had pulled over and stopped near the barn during the incident. Once the shots were fired, she saw someone get out of the truck and heard that person yelling right after the shots were fired.

She then ran back inside the house to check on her daughter and later went outside again to see if she could help. When she got outside, she saw a man standing next to the sports car holding a gun. Not knowing what was going on, she decided that it was not safe and went back inside the house. Later on, she walked down to a neighbor's house where she noticed that additional police and emergency vehicles had arrived.

**2. Gregory P. Floyd** was driving his father's 4X4 Silverado pickup truck on May 11, 2007. The State Police interviewed him on May 11, 2007. Greg stated the following: That he and his father left their home on the afternoon of the shooting to go to the store. They pulled into Mack's Market in Franconia and parked their truck. At the market,

3

there had been a 2-door greenish/gray colored Toyota or Honda car parked next to them with two men in it. Both men wore Agway shirts. The driver had long blonde hair and was not anyone he had seen before. The passenger had shorter hair and was familiar to him because he had seen him one time before in the Agway store. The two men bought some items in the market and then left before he and his father had left. After that, he and his father went to Bob's Mobil before they started toward home.

As he drove his father's truck along Rte. 116, they passed the Kinsman Lodge in Franconia. He saw a police cruiser in the road that was facing toward the car he had seen earlier at the market. The two men in the car "flipped the bird" to the officer, which appeared to upset the officer. The officer then motioned, with his hand out the window, telling the driver to move his car over onto the dirt road by the barn. The car backed up slowly as if the driver was going to cooperate, but then all of a sudden the car moved forward as if trying to leave. The officer rushed forward with his cruiser and pushed the car back in the direction of the loader that was parked on the dirt road. The officer then got out of his cruiser and walked over to the car's driver's side window, which was open. It appeared to him that the officer was trying to grab something from the driver but whatever it was slipped from the officer's hand. The driver grabbed it again and then started shooting at the officer. The sun hit whatever was in the driver's hand and made it flash very brightly.

After the shooting started, the officer ducked and ran halfway across the road. The officer was holding his side and dropped the pepper spray he had been holding. The driver of the car fired again, with his hand out the window of the car, and the officer then

4

fell on the grass.  At that point, the officer was not moving.  The officer never fired his gun.  Instead, he had unhooked the protector from his gun and the gun fell out of his hand as he fell to the ground.

His father told him to edge up with the truck and pull alongside the road where the officer was.  He then saw the car drive across the road toward the officer.  He also saw that the driver tried to run the officer over, stopping or landing at the officer's arm.  He could see the officer and told his father that the officer was bleeding and did not look well.  The car backed up and then his father got out of the truck to help the officer.  His father wanted to drag the officer in front of their truck because it was heavier than the car and if the car tried to hit the truck it would be able to take the damage.  His father was going to do this because they did not want anything to happen to the officer.

His father went over to the officer and then he saw the car drive forward again toward his father and the fallen officer.  He saw the driver's arm out the window of the car with the gun over the roof shooting, like what one would see in a "gangster" movie.  His father was next to the officer trying to pull him in front of their truck.  He believed that the driver was trying to shoot at his father and run him over as well as the officer.  When the car rushed forward, his father jumped out of the way, grabbed the officer's gun off the ground and fired once at the driver.  The car stopped with the bottom of its front end on the officer's chest.  He had gotten out of the truck after the first shot because his father had told him to go to the officer's cruiser and call for help.

As he was going over to the cruiser, he heard his father tell the driver not to reload the gun.  When he looked back over his shoulder, he saw his father fire a second shot at

5

the driver and saw the driver's head go to the side.  This was the last shot fired at the

driver.  His father then screamed at the passenger to get out of the car.  The passenger

was covering his eyes, crying and saying that he did not want to get out of the car.  His

father fired three warning shots into the air, told the passenger that he would not warn

him again and to get out of the car.  After that, the passenger got out of the car and onto

the ground.  He said that his father had both guns pointed at the passenger.

After the incident, his father helped others lift the car off the officer.  His father

also used his shirt as a tourniquet in an attempt to stop the officer's arm from bleeding.

At the scene, the passenger from the car said that his father had shot his friend and that he

was dead.  He told the passenger that the passenger and his friend tried to run over and

kill his father.

He said he had seen Cpl. McKay around Franconia before and that Cpl. McKay

was always nice.  He had never had any problems with Cpl. McKay.

**3.  Gregory W. Floyd** was a passenger in a pickup truck driven by his son,

Gregory P. Floyd on May 11, 2007.[1]  The State Police interviewed him on May 11, 2007.

Floyd stated the following:  That on the day of the shooting, he and his son drove on Rte.

116 in Franconia toward Easton.  Along the way, he saw a police cruiser bumper to

bumper with another car.  The police cruiser pushed the other car back up against a

bulldozer and then the officer got out.  The officer walked over to the driver's side of the

car and then he turned away for a second.  He then heard one shot and looked back and

---

[1] Military records confirm that Gregory W. Floyd was in the Marine Corps. from 1976 to 1979 and received an Honorable Discharge.

saw the officer running across the road, holding his side.  The officer had his gun out of his holster and was holding it in his right hand as he ran across the road.

The car, which was behind the officer, ran the officer over as the officer got across the road onto the grassy area on the other side.  The officer was facing away from the car when he was hit.  The officer struggled and then the car backed up and hit the officer again.  He saw a gun flying before it landed on the grass about three feet from the passenger side of the car.  He believed that the gun came out of the car but could not be positive as to whether it possibly came out of the officer's hand.  After having been struck, the officer ended up under the car toward its front end.  At that point, he thought that he could get the gun he had seen in an effort to help the officer.

He had his son drive across the road to the other side and then told his son to go to the police cruiser to call for help.  He got out of his truck after the officer was struck a second time and walked over to where the gun lay on the grass.  He then picked up the gun and moved the slide to check to ensure that the gun was loaded.  When he walked over to the passenger side of the car and looked in, he saw that the driver was holding a gun with both hands down near his lap.  The gun was pointed toward the passenger door of the car (where Floyd was standing).  It appeared to him that the gun was jammed and that the driver was manipulating the gun, attempting to clear the jam.  He told the driver to stop.  He said to the driver: "Stop;" "Put it down or, you're gonna die;" and "Leave it alone, you know you want to live?"  He told the driver whatever came into his mind because he thought he could convince the driver to let the gun go so he would not have to shoot him.  The driver, however, looked up at him once and kept manipulating the gun.

7

After that, he shot the driver one time, maybe twice, took the driver's gun and ordered the passenger out at gunpoint.  After others arrived at the scene, he helped lift the car off the officer.  He used his own shirt as a tourniquet to try and stop some of the officer's bleeding.

During the interview, Floyd described his thought process as follows: he was defending someone that was helpless (the officer); he was not looking to kill anybody; he was not going to watch an innocent man be run over time and time again; he felt the driver was trying to kill the officer; the driver could have shot him (Floyd) too; what was done to the officer was "torture;" and he felt the driver was clearly a threat and thus felt threatened by him.

Floyd told the State Police investigators that he did not know the police officer nor the driver or passenger in the other car.  Further, during the incident he did not hear the officer, the driver or the passenger say anything.

**4.  Caleb A. Macaulay** was a passenger in Liko Kenney's car on May 11, 2007. The State Police interviewed him on May 11, 2007.  Macaulay stated the following:  That he had known Kenney his whole life.  The previous day, May 10, 2007, they had worked together. After work that day, they had gone to Kenney's house, watched a DVD, drank four to five beers each and then went to bed.  The next morning, Kenney drove him to his house so he could get some clothes.  They stopped at a store to get food for lunch and then went to work at Merrill's Agway.

They left work at around 5:30 p.m. on May 11, 2007, and then went to the liquor store where they purchased some alcohol.  After that, they then went to the market to buy

other items.  They drove in Kenney's light blue Toyota Supra along Rte. 116 toward

Kenney's house.  He estimated that they were traveling at 45-47 miles per hour.  Kenney

usually liked to drive fast.  When they saw a police cruiser, Kenney slowed to about 35

miles per hour.  At that time, they did not know who the officer was driving the cruiser.

Kenney did not immediately pull over when the officer tried to stop him because

he was looking for a place to pull off the road.  Once the officer walked up to the car,

Kenney realized that it was Cpl. McKay.  Cpl. McKay did not tell Kenney why he pulled

him over.  Cpl. McKay asked Kenney for his license and registration.  Kenney did not

give them to Cpl. McKay but instead, told him that he wanted another officer.  Cpl.

McKay told Kenney that he could not make that choice, but Kenney repeatedly asked that

another officer be summoned.  When Cpl. McKay told Kenney that he would not do that,

Kenney attempted to call someone on his cell phone.  Kenney became tense during the

stop and appeared really scared.  Kenney also rolled up his window most of the way and

left it that way during the stop.  Kenney was unable to reach anyone on his phone and he

did not know who Kenney was trying to reach.  Kenney seemed mad because he could

not reach anyone on the phone and then drove away from Cpl. McKay.  At that point,

nothing seemed wrong, but he was mad at Kenney for driving off.

As they drove away, Kenney told him that he was trying to go to his uncle's house

so there would be witnesses.  He expressed displeasure with what Kenney was doing, but

Kenney continued driving down the road.  Cpl. McKay came up behind them with his

lights and siren on and then passed them as they went by the Kinsman Inn.  They stopped

in the road and Kenney gestured indicating he wanted to go to the Tamarack (where his

uncle was located down the road).  Cpl. McKay was saying, "No, no," and gestured over to the side where there was a dirt driveway.  Kenney backed up into the dirt driveway and Cpl. McKay followed.  As they stopped the car, Cpl. McKay rammed them and pushed them back fifteen to twenty feet almost into a Caterpillar in the driveway.  Kenney said, "No, no.  Stop pushing my car."  They were not touching the Caterpillar and still had room to back up and leave.  Before Cpl. McKay rammed them, a man and his son in a pickup truck stopped on the side of the road and watched them.  He did not know these two people but yet he still motioned and yelled at them to stay for a minute as witnesses.

Once they came to a stop, Cpl. McKay got out of his cruiser, went up to Kenney's window and without saying anything, sprayed them with "mace."  From that point on, he really could not see.  Then he heard shots coming from the car and believed it was Kenney firing.  He tried to look and saw Kenney with the gun in his hands.  He believed that he caught a glimpse of Cpl. McKay as he went behind his cruiser for cover.  From the sound of the firing, he believed that Kenney emptied the gun's clip firing maybe nine to twelve shots.  He did not realize that Cpl. McKay had been hit at that time and thought Kenney may have been firing into the air or something.

He knew Kenney owned a .45 caliber handgun that he sometimes kept in his car.  Kenney had told him that the gun was not loaded and that he kept the clip separate from the gun in the car.  He was pretty sure that Kenny must have had the gun on the floor by his seat during the incident.  However, he had not seen the gun before the shooting had started.

After the shots had been fired, Kenney backed the car up and then drove forward. He saw Cpl. McKay lying on his back on the other side of the road on the lawn. He also saw Cpl. McKay's gun on the ground near him or in his hand. Without saying anything and for reasons unknown to him, Kenney drove his car onto Cpl. McKay as he was on the ground. He surmised that Kenney might have driven over Cpl. McKay because he could not see as Kenney had taken most of the pepper spray. He did not know what Kenney was trying to do but that Kenney ended up pretty much with his car's bumper on top of Cpl. McKay.

He saw the man who had been in the truck pick up Cpl. McKay's gun. He said that the man had driven across the road right next to where Cpl. McKay was lying on the ground. This man walked over to his window as they drove toward Cpl. McKay and fired through his window. He believed the man fired more than twice and said that the man said nothing before he fired. He managed to lean forward when he saw the gun and said that he felt the shots go over his back. He said that the car was stopped and that the glass shattered.

After the man fired the shots, he sat up and looked at the man. He said that the man held the gun and yelled at him to get out of the car. The man also told him to hand him Kenney's gun, but Macaulay said, "No" because he believed that the man would shoot him. He told this to the man. While he was still in the car, he looked over at Kenney and saw that he was dead. He unbuckled his seat belt, got out of the car and sat on the ground. The man with the gun ranted, told him he had killed before, told him to stop talking and told him to be quiet. The man also told him that he (Macaulay) tried to

11

run him over and tried to kill the police officer. He told the man that he did not do anything and was just a passenger. He said that the man told him that if he did not stop moving and crying that he would shoot him. He responded that if he were shot, it would be murder. The man said that it would not be murder because he was on medication. The man went into the car and got Kenney's gun but was having problems with the gun.

Shortly after that, emergency medical technicians arrived and made the man drop the guns. He saw some paramedics lift the car off of Cpl. McKay.

He was searched several times at the scene, was treated by the emergency medical responders and was then placed in a police cruiser.

He knew Cpl. McKay and had been aware that some people in town had had "trouble" with Cpl. McKay and some others had not. What he heard was just "word of mouth" and he had never been arrested by Cpl. McKay. He had, however, heard from Kenney and others that there had been a "past" between Kenney and Cpl. McKay. From what he had heard, Kenney had been asleep in a car at Fox Hill and Cpl. McKay had ripped him out of the car although he had never heard the full story. He also said that other people who were friends with Kenney had a negative opinion of Cpl. McKay. He understood that Cpl. McKay was "harder mannered" and blunt with people.

During the interview, Macaulay also talked about how the man (Gregory W. Floyd) treated him at the scene. He said that he could "understand what he [Floyd] did, he [Floyd] stood up for a cop and he was doing a great job...." and that "he [Floyd] was doing the right thing...."

12

**5.  Susan M. Thompson** gave a statement on May 11, 2007, and was interviewed by the State Police.  She stated the following:  That she had been in the office at the back of her home at 2165 Easton Road in Franconia on May 11, 2007, when she heard a siren.  She looked out her window and saw a gray car go by with a police car following close behind.  The gray car stopped and then the police car turned around in the road so that it was nose to nose with the gray car.  The police car pushed the gray car down into the gravel area opposite 2203 Easton Road.  The garage in that area obscured the gray car, however, she still saw the police car.  After that, she heard pop, pop, and saw the police officer as he crossed the road clutching his chest.  She also saw a dark gray pickup truck head south on the road and then stop.  She went back to the kitchen and dialed 911, took the phone and looked out the window.  She saw the gray car come across the road toward the officer.  At that point, the man in the pickup truck moved his truck a bit further south beyond the driveway (at the scene).  She saw the man from the pickup truck standing at the back of or behind the gray car.  It appeared to her that he was agitated and had a gun in each hand.  She thought she also saw movement from the other side of the gray car, on the southbound side.  After that, emergency responders arrived at the scene.

**6.  Chester Thompson** gave a statement on May 11, 2007.  He stated the following:  That he was inside watching TV at his home at 2165 Easton Road in Franconia on May 11, 2007, when he heard a siren coming toward his home.  He looked out and saw a police vehicle ahead of a silver car in the road.  Thompson said that the police vehicle made a turn in the road and faced the car.  The car backed up into the dirt lot across the street and then the police vehicle pushed it back into the dirt lot.  The police

officer got out of his vehicle and walked around the back of his cruiser and approached the car with what Thompson believed was a gun in his hands. Thompson said that he could not see the silver car from where he was. He heard several shots and saw the police officer come across the street and fall down. Thompson said that there was also a gray pickup in the road and that he went to call 911.

Thompson heard more shots while he was on the phone and looked outside. He saw the silver car had come across the road and saw a man with no shirt on and holding a gun trying to help the officer.

7. **Nancy Van Kleeck** gave a statement on May 11, 2007. She stated the following: That she was inside the Kinsman Lodge on May 11, 2007, when she heard sirens outside. She looked outside and saw vehicles moving at a "normal speed." She saw a cruiser pass a silver car and then turn around in the road. The silver car backed into the dirt lot and then the police officer moved toward the silver car. She heard loud noises and saw the police officer cross the street. After that, she went to find Chester Thompson.

8. **Brandon Sherburn** gave a statement on May 11, 2007. He stated the following: That he was outside his home on Easton Road in Franconia with his father on May 11, 2007, when he heard sirens. He said that a small blue car pulled into a dirt driveway next to an old white barn. He then heard two shots and followed by maybe five more shots. He and his father ran up to the property and saw the small car on the lawn with someone underneath it. A man later identified as Gregory W. Floyd was at the scene with his shirt off. Several more people arrived and rolled the car off Cpl. McKay.

Floyd had the passenger from the car (Caleb Macaulay) outside.  Macaulay was yelling at

Floyd that he had almost shot him.  Floyd responded by saying something to the effect of,

"I was trying to save a life."  Sherburn said that after that exchange, an officer arrived

and got Floyd to lay down his guns on the ground.

### B.   Other Witnesses to Significant Events Related to The Shooting

**1.  Alison Morris** was out for a walk on Route 116 at about 5:55 p.m. on May 11,

2007.  She heard a loud engine and as the car approached her, recognized the car as

"Liko's car."  Morris knew Kenney was going too fast and said that shortly thereafter,

she saw Cpl. McKay go by in his cruiser and turn around.  She heard a siren go on after

both cars were out of sight.

**2.  Cindy A. Carpinetti** was traveling on Route 116 in Franconia between 6:00

and 6:30 p.m.  She witnessed a motor vehicle stop by a Franconia Police officer on a

small pull off on the west side of Route 116.  As Carpinetti drove by the stop, she saw the

car pull out and the police officer casually walking back to his cruiser.

**3.  Officer Phillip R. Blanchard** was on duty on May 11, 2007, as a Sugar Hill

police officer.  At around 6:00 p.m. he heard Cpl. Bruce McKay on the radio state that he

was about to initiate a motor vehicle stop and that Liko Kenney was in the vehicle.

Blanchard started to respond to Cpl. McKay's location and along the way, heard Cpl.

McKay say that he had the car stopped.  A short time later, he heard Cpl. McKay say that

he was in pursuit of the vehicle heading south on Route 116 toward Easton.  Blanchard

heard dispatch calling for Cpl. McKay to determine his status but there was no response

from Cpl. McKay.

Blanchard continued heading toward Cpl. McKay's direction and then heard Cpl. McKay say on the radio, "Officer down. I've been shot." An unidentified person came on the radio screaming and asking for help. Blanchard arrived at the scene and saw Kenney's car off the left side of the road with a boot sticking out from under the car. He heard a command to put some guns down and focused his attention on a large, bald male later identified as Gregory W. Floyd. Floyd held two guns and Blanchard began to yell at Floyd to drop the guns. Floyd just stared at Blanchard so Blanchard told him several more times to drop the guns. When Floyd did not drop the guns Blanchard again told him to drop the guns. Floyd started to lower the guns to the ground and said to Blanchard, "Easy son, I'm quicker than you." The guns were placed on the ground and an officer was assigned to stand guard over the guns.

After dealing with Floyd, Blanchard helped others lift the car off of Cpl. McKay. He then assisted Caleb Macaulay across the street and sat Macaulay down in front of a police cruiser. Floyd and his son walked over and Floyd's son began yelling at Macaulay about the fact that Macaulay had tried to run him and his father over. Macaulay responded and said that he had done nothing wrong and was just a passenger. Blanchard separated the two Floyds and Macaulay and asked Gregory W. Floyd if he was okay. Floyd said that he was fine and that this was the forty-third person he had killed.

**4. Sam Stephenson** was on Route 116 driving from Easton to Franconia on May 11, 2007, at approximately 5:30 or 6:00 p.m. His friend Chuck Hebert was behind him in his car. As he approached the scene, he saw a gray truck on the side of the road as well as Liko Kenney's car and a Franconia police cruiser on the other side of the road. He

16

noticed that the glass was missing from the passenger side window of Kenney's car.  He thought that he had come upon an accident.  However, he also noticed that there were no skid marks on the road.

As he started to stop, Stephenson saw that Kenney was hunched over in his car and that Kenney's car was on top of someone.  Stephenson pulled over, got out of his truck and went up onto the lawn.  He then saw Greg (W. Floyd) holding two guns in his hand.  Greg had the guns pointed down and was telling him not to come any closer.  He could see Greg near the car and Caleb (Macaulay) sitting on the ground.  Stephenson and his friend turned around and walked toward the road.  At about the same time, (Sgt.) Dave Wentworth arrived and told Floyd to put the guns down.  Stephenson and others then helped lift Kenney's car back and off of Cpl. McKay.  He then leaned into the car and checked on Kenney.  He confirmed that Kenney was dead.  He also noticed that Floyd did not have a shirt on because his shirt had been used as a tourniquet on Cpl. McKay's arm.

He stated that Caleb was on the ground crying, screaming and saying that he could not believe what had happened and that his friend had been shot.  Floyd's son then said to Caleb that he was lucky he had not been shot because he and his friend tried to run Floyd's father over.

While he was at the scene, he spoke with Floyd about what had happened.  Floyd told him that he came along and Cpl. McKay got shot and ran away.  Then, Kenney ran Cpl. McKay over twice and Cpl. McKay's gun had come out.  Floyd said that the car was on top of Cpl. McKay.  Floyd told Stephenson that he ran over and picked up the gun.

17

Floyd looked in the car and saw Kenney inside loading the gun in an attempt to shoot again. Floyd said that he then shot Kenney and got Caleb out of the car. After that, Floyd said he took Kenney's gun out of the car and had both guns in his hands.

**5. Sergeant David Wentworth** was on duty on May 11, 2007, as a Sugar Hill police officer. At approximately 6:00 p.m., he heard Cpl. Bruce McKay over the radio say that he was making a stop of Liko Kenney. Wentworth started to drive toward Cpl. McKay's location. He said that at the time, he was aware of the prior incident where Kenney "was completely out of control" and had grabbed Cpl. McKay between the legs.

As Wentworth drove to assist Cpl. McKay, he heard Cpl. McKay come over the radio saying that he was in a pursuit and headed toward Easton. Wentworth said he was quite a distance from Cpl. McKay's location but continued to head in that direction. Prior to arriving at the scene, Wentworth heard dispatch asking Cpl. McKay for updates and heard nothing in response from McKay. Then he heard the radio "getting keyed and a siren in the background and a bunch of voices." A voice came over the radio that said something about, "He tried to run him over," "He's been shot," and "I think he's dead." Wentworth did not recognize the voice and thought it was a female's voice.

Wentworth arrived at the scene and saw several vehicles there, including rescue personnel. One of the vehicles was a light blue, older model hatchback. Nearby, there was a man seated cross-legged on the ground with his hands on his head. Wentworth had asked the man who he was and he responded, "Caleb." He then looked over toward the car and saw a man inside who he believed was Liko Kenney. Wentworth noticed that Kenney's hands were on his lap and that he appeared to be dead. He also saw that Cpl.

McKay was under the car, toward the front near the axle, and that his legs were coming out the driver's side. Wentworth heard someone yelling, "Put the gun down" and saw a shirtless man putting guns on the ground.

Wentworth and some others at the scene lifted the car backwards off of Cpl. McKay. He said that once the car was lifted, he could see that Cpl. McKay was alive and taking breaths. However, Cpl. McKay's uniform was ripped, he had obvious injuries and Wentworth believed, "He was in really bad shape."

Wentworth also witnessed an exchange between the man at the scene (Floyd) and Caleb. Caleb said something and Floyd responded with profanity stating to Caleb something like, he had tried to run him (Floyd) and his son over. Caleb responded that he was just a passenger.

Wentworth took some pictures at the scene and directed someone to guard the two guns on the ground. In the meantime, rescue personnel attended to Cpl. McKay and other officers arrived.

While he was at the scene, Wentworth learned that Floyd had used Cpl. McKay's gun to shoot Liko Kenney and that the other gun at the scene belonged to Kenny. He had never before met Floyd or Kenney, although he was aware that Kenney was someone the police had had prior dealings with.

### C.    Audio and Video Evidence of the May 11, 2007 Incident

Some portions of the events of May 11, 2007, were captured on audio and video equipment.

19

### 1. Police Cruiser Videotape and Audio Recording

At the time of the incident, there was a video recorder mounted in Cpl. McKay's police cruiser.[2]  The video recorder activated automatically when the cruiser's blue lights were activated.  The camera was mounted on the windshield near the rearview mirror.  There was also an audio transmitter in the cruiser and one on Cpl. McKay's duty belt, which was activated manually.  There is very little audio associated with the video and in addition, portions are difficult to hear.  The video has been reviewed and steps were taken to enhance the audio portions of the recording.  The following summarizes of significant events that were captured on the video:

| Time stamp (hr/min/sec) | Event captured |
| --- | --- |
| 19:09:40 | Cpl. McKay turns around to make the initial stop of Kenney on Rte. 116. |
| 19:10:26 | Cpl. McKay pulls over behind Kenny on a turnoff on Rte. 116. |
| 19:10:55 | Kenney's driver's side window can be seen being rolled up most of the way and the window remains that way during the stop. |
| 19:12:47 | Kenney's car pulls out and leaves, with tires leaving marks in the dirt in the process. |
| 19:12:58 | Cpl. McKay proceeds out after Kenney. |
| 19:14:05 | Cpl. McKay's cruiser passes Kenney's car on Rte. 116. |
| 19:14:15 | Cpl. McKay comes to a stop on Rte. 116. |
| 19:14:26 | Cpl. McKay starts to back up and turns around. |

---

[2] The date and time stamp on the video are inaccurate.  The time stamp is one hour ahead (it shows the event occurring at approximately 1900 hours instead of at approximately 1800 hours) and the date stamp is one day behind (it shows 05/10/2007 instead of 05/11/2007).

| | |
|---|---|
| 19:15:02 | Cpl. McKay's cruiser faces Kenney's car. Floyd's truck appears in the background. |
| 19:15:35 | Cpl. McKay pulls forward toward Kenney's car which has backed into the dirt driveway. |
| 19:15:38 | Kenney's car starts to move forward as Cpl. McKay's cruiser approaches. |
| 19:15:41 | Cpl. McKay's cruiser hits the front of Kenney's car. |
| 19:15:48 | Cpl. McKay's cruiser stops pushing Kenney's car backwards. |
| 19:15:55 | The audio is activated and the cruiser's siren can be heard. |
| 19:15:57 | Cpl. McKay approaches the driver's side of Kenney's car. A male voice is heard saying, "What are you doing?  What are you doing?" Cpl. McKay begins spraying the OC (pepper spray) into Kenney's car with his right hand. Cpl. McKay's gun is not drawn. |
| 19:15:58 | Cpl. McKay stops spraying the OC and moves away and from Kenney's car. |
| 19:16:00 | Kenney moves his arms up and out of his car window firing his first shot. Cpl. McKay is out of the camera's view. Kenney holds the gun with both hands and fires and tracks with his gun. |
| 19:16:02 | Kenney fires his last shot of seven shots captured on the video. |
| 19:16:06 | Cpl. McKay groans. |
| 19:16:22 | Kenney backs up his car. |
| 19:16:28 | Kenney's car's tires spin as the car moves forward. |

21

19:16:32                          Kenney's car drives out of the camera's view.

19:26:29                          Video continues from the front of cruiser.


Audio can be heard as follows:

    Caleb Macaulay:                "...dragged me out of the car."

    Gregory W. Floyd:             "If I wanted to shoot you, you'd be god damn dead."

    Gregory P. Floyd:             "You tried to run over my father."

    Caleb Macaulay:               "I was in a passenger...."

    Gregory P. Floyd:             "You tried...."

## 2. Radio Transmissions

Copies of radio transmissions from Cpl. McKay's police cruiser and other units were obtained from Grafton County Dispatch. The copies obtained are time stamped from 6:04:03 p.m. until 6:20:38 p.m. on May 11, 2007. The following summarizes significant radio transmissions:

| Time | Event captured |
| --- | --- |
| 6:04:03 p.m. | 44K (Cpl. McKay) calls in stop with Liko Kenney. Reports Kenney has a passenger and the registration is expired. Cpl. McKay asks for the Sugar Hill unit to respond to the scene. |
| 6:05:50 | Unit 47C acknowledges to dispatch that he heard Cpl. McKay's request for backup and is responding. |
| 6:06:50 | Cpl. McKay advises that he is in a pursuit southbound into Easton. The vehicle is a blue Toyota Supra and the subject is disobeying. |

| | |
|---|---|
| 6:07:50 | Unit 520 advises he is clearing an accident at Russell Farm Road and will start moving toward the Easton Town line. |
| 6:09:15 | Grafton dispatch calls for Cpl. McKay several times with no response. |
| 6:10:21 | Grafton dispatch calls for Cpl. McKay with no response. Grafton dispatch asks another unit, 520B to go to area. |
| 6:11:20 | Male voice (Gregory P. Floyd) yells, "Officer down, officer down!"  Siren can be heard in the background. |
| | Gregory P. Floyd says, "They tried to shoot my father!" |
| | Other radio traffic, some undecipherable. |
| 6:12:37 | Gregory P. Floyd yells, "I, I...he had a gun because he tried to take it and all of the sudden he starts shooting at the cop, but I, I, the police officer, I, I think he's dead and, and then shot at my Dad and then he tried to run over the officer and my fa-" |
| | A police unit asks if the car is still there. |
| | Gregory P. Floyd says, "The cop's car and also the car he was chasing is still on the scene, they're parked alongside the road." |
| | A unit asks Floyd a question about the shooter and Floyd says, "The people that the officer was trying to stop all of the sudden just started shooting at him and then my Dad had me stop and then he tried to help the officer, then they tried to shoot at him and run over the, my Dad and the officer, their car is still over the officer and my Dad is doing his best to keep the other one from trying to tackle him or something." |
| 6:16:45 | Radio traffic between police. |
| | Gregory P. Floyd says, "I couldn't hear you.  I, I don't know how to turn the sirens off.  I can't barely hear anything." |

"All I know is that these people just killed this officer and I, my Dad had me come to try and get help.  I don't know what to do."

Dispatch tells Floyd not to talk anymore on the radio until they call him.  Floyd says, "Okay."

Unit announces they are at the scene and gives location. Floyd says, "They're here."

### 3. 911 Calls

Three 911 calls were received on May 11, 2007:

A female made the first call.  She reported that shots had been fired and a policeman had been shot at 2203 Easton Road.  She stated that it appeared to her that the suspect was arguing with someone else with a gun in the driveway;

The second caller was a male who stated that an officer was down at 2203 Easton Road in Franconia and that shots had been fired.  The caller stated that he was looking out his window and could see a bald headed man with a gun in his hand that had fired several shots and was pointing the gun at someone.  The caller said that the officer was in pursuit of the car and then shots were fired; and

The last caller was a male.  He reported what might have been shots fired and said he could still hear the police car.

### D.   Autopsies

### 1. Cpl. Bruce McKay

Dr. Thomas A. Andrew, the State's Chief Medical Examiner, conducted an

autopsy on Cpl. McKay on May 12, 2007.  He noted five wounds caused by a firearm: a

superficial through and through injury to the right forearm and four wounds to the right

side.  Cpl. McKay also had blunt impact injuries which included: lacerations to the scalp;

a laceration to the nose and lower lip; a fracture to the skull; a laceration to the left upper

groin region; a fracture to the left pelvis; and a laceration below the left knee.  Four

projectiles were recovered from Cpl. McKay's body during the autopsy. The cause of death was multiple gunshot wounds. The manner of death was homicide.

Toxicology testing revealed an incidental finding of caffeine.

### 2. **Liko Kenney**

Dr. Thomas A. Andrew also conducted an autopsy on Liko Kenney on May 12, 2007. He noted two wounds caused by a firearm, one to the right side of the head and a through and through wound with the entry to the right side of the neck and the exit on the left. Kenney also had a faint, oily orange residue on the right side of his face (consistent with OC spray). One projectile and fragments were recovered from Kenney's body during the autopsy. The cause of death was two gunshot wounds, one to the head and one to the neck. The manner of death was homicide.

Toxicology testing revealed the presence of THC, which indicated recent consumption of marijuana prior to death. There were also incidental findings of caffeine and Theobromine (likely a metabolite of caffeine or chocolate).

### E.   **Forensic Evidence and Evidence From the Scene**

The New Hampshire State Police Major Crime Unit conducted a search of the scene, vehicles and buildings surrounding the crime scene. Some of the evidence gathered was taken to the New Hampshire State Police Forensic Laboratory for examination. The following summarizes the evidence which was collected:

**The Roadway and Surrounding Area:**  A blood trail was discovered on the roadway and extended across to the opposite side of the road.  Two handguns, spent shell casings, sunglasses, a police radio and an OC container were found in the grassy area across the road.  Blood was also found on the grassy area across the road where Cpl. McKay had been trapped under Kenney's car.  Medical supplies and equipment were left at the scene as well.  A red pickup truck was near the barn and was not connected to the incident.  A hole was located on the side of the barn which was consistent with a bullet hole and bullet was found inside a toolbox in the barn.[3]

**Cpl. McKay's Firearm:**  Cpl. McKay's firearm was a .45 caliber Sig Sauer semi-automatic pistol.  It had one live Federal round in the chamber and a magazine with one live Federal round.

**Cpl. McKay's Police Cruiser:**  A search of Cpl. McKay's cruiser yielded the cruiser video and a radar readout which was locked with a target speed of 54 miles per hour and a patrol speed on 39 miles per hour.  There were tire impressions in the dirt in front of and behind the cruiser.  The cruiser's front  license was bent.

**Liko Kenney's Firearm:**  Liko Kenney's firearm was a .45 caliber Hi-Point semi-automatic pistol.[4]  It had one live Winchester round in it and a magazine with three live Winchester rounds.

Scott Walker had originally bought the pistol in Whitefield, New Hampshire at The Village Gun Store.  Walker sold the pistol to Steven Dunleavey in July of 2003.  Walker said that the gun was cheap and would frequently jam.  Dunleavey said he only had the gun for two months and that it jammed on every fifth round.  He said that he sold the pistol to Matthew Chernicki.  Chernicki said that he had the pistol for about eight months and then sold it to Liko Kenney.

**Liko Kenney's car:**  The car was a blue 1984 Toyota Celica Supra Coupe with an expired (April 2007) New Hampshire registration (1961215).  Liko Kenney was seated in the driver's seat with his hands on his lap.  He wore a t-shirt and shorts.  There was blood on the inside of the car.  There was also blood as well as blood spatter on Kenney's body.  The driver's side window was down most of the way.  The sunroof was partially open.  The passenger side window was in the fully up position but the glass was in fragments.  Broken glass was found inside and outside the car.  The windshield was cracked and had a bullet hole in the lower cowling.  There was damage to the front of the car, including  damage to the

---

[3] Based on the State Police crime scene reconstruction, it appears this bullet came from a shot fired by Gregory W. Floyd.

[4] Kenney did not have a permit to carry a concealed firearm.

spoiler under the front bumper. The spoiler was cracked and had a blood smear near the crack.

The following items were also recovered from the car:

> Numerous personal items;
> A metal smoking pipe;
> Juice and a half-gallon of Vodka;
> A lead projectile fragment from the front windshield;
> A Nokia Trac Fone on top of the center console;
> A film canister containing what appeared to be marijuana seeds;
> A piece of cloth and a rag were also found on the driver's side floor; and
> An empty handgun magazine on the driver's side floor underneath Kenney's right leg.

The Trac Fone was examined and found to contain a record of several outgoing calls. Three calls were placed to three different phone numbers around the time of the incident. According to the Trac Fone's records, the calls were placed at 6:05 p.m., 6:06 p.m., and 6:07 p.m.

**Gregory W. Floyd's Truck:**  The gray colored 2000 Chevrolet 4X4 pickup truck was searched and nothing of evidentiary value was located.

**Residence at 2203 Easton Road:**  A broken window, a bullet hole and a bullet were recovered from inside the residence which was located near the scene of the incident.[5]

**Bullets and shell casings:**  Five spent Winchester .45 caliber shell casings were found on the ground near the front of the police cruiser. Two spent Winchester .45 caliber shall casings were found between the hood and windshield of Liko Kenney's car. Six spent Federal .45 caliber shell casings were found on the grass near Kenney's car. One live Winchester .45 caliber round was found on the grass near Kenney's car. A .45 caliber bullet was found on the grass near Kenney's car. A bullet was recovered from a toolbox in the barn at the scene. A discharged bullet jacket was also recovered from the scene.

---

[5] Based on the State Police crime scene reconstruction, it appears this bullet came from a shot fired by Gregory W. Floyd.

**Forensic Testing:**

The State Police Forensic lab examined the two pistols recovered from the scene. Both were test fired and found to function normally.

The two magazines associated with Liko Kenney's pistol had a maximum capacity of nine cartridges.

Seven discharged cartridge cases recovered at the scene were found to match Liko Kenney's pistol.

Four discharged bullets were recovered from Cpl. McKay's body during the autopsy of his body and each bullet was found to match Kenney's pistol. One discharged bullet jacket was also found at the scene which matched Kenney's pistol.

Six discharged cartridge cases were recovered at the scene and found to match Cpl. McKay's pistol.

Four discharged bullets recovered from the scene were found to match Cpl. McKay's pistol. One additional discharged bullet and fragments were recovered from Kenney's body during the autopsy of his body and matched Cpl. McKay's pistol.

## F.     Liko Kenney's Prior Encounters With Law Enforcement

On January 2, 2003, Liko Kenney had cut down trees on his uncle John "Bill" Kenney's property in Easton, New Hampshire. One of the trees which was cut fell onto the roof of John Kenney's house and damaged the roof. Larisa Kenney, John Kenney's wife, had been home during the January 2, 2003 incident, and had taken pictures of Liko Kenney cutting down the trees. After Liko spotted Larisa with the camera, he angrily confronted her and yelled at her, asking for the camera. Larisa eventually left the cabin and went to a neighbor's house for help. Liko had followed her and had tried to catch her but she ran away from him. Larisa said that during this time, Liko kept asking her where the camera was. On January 3, 2003, Larissa Kenney applied for an Emergency Order of

Protection from the Grafton County Superior Court as a result of Liko Kenney's behavior. That order was granted and prohibited Liko from entering upon Larissa Kenney's land and residence and directed him to stay at least one hundred feet away from Larissa and prohibited him from having any contact with Larisa.

On January 26, 2003, Franconia Police Officer Bruce McKay checked on a car which had been parked in a lot at Fox Hill Park.[6] When Officer McKay looked into the car he saw a male subject subsequently identified as Liko Kenney reclined in the front driver's seat. McKay knocked on the window and spoke to Kenney. Kenney initially refused to provide his driver's license and registration. He argued with Officer McKay when he got out of his car and ignored repeated orders to return to his car. Officer McKay called for backup and with the assistance of other police officers tried to handcuff and take Kenney into custody. During this process, Kenney struggled with Officer McKay and the other officers and grabbed Officer McKay's testicles. McKay struck Kenney in the face so that Kenney would let go of his testicles. A State trooper arrived a short time later and attempted to speak with Kenney. Kenney however, yelled obscenities and said that he was being tortured and molested. Kenney continued this behavior until he was taken from the scene by ambulance. A doctor at the Littleton Hospital examined Kenney. The doctor found that Kenney had swollen and reddened wrists due to the handcuffs. He also observed some slight swelling and tenderness to Kenney's jaw. Just before Kenney was released from the hospital, he said to Franconia Officer Jon Stephens, "Will you shoot me?" After Officer Stephens said no, Kenney

---

[6] The cruiser video and audio recording of this incident were reviewed.

29

replied, "Well, I guess I'll just have to kill myself." Kenney's suicide threat was relayed to the treating physician who requested a mental health evaluation of Kenney. Kenney's parents arrived at the hospital and after the mental health evaluation was completed, he was released. On December 22, 2003, Kenney pled guilty and was convicted of simple assault of a police officer and resisting arrest or detention in the Grafton County Superior Court.

On April 27, 2003, John "Bill" Kenney had reported that a four-wheeler was being operated on the Kinsman Trail and trespassing on his property. Several police officers responded, including Easton Constable Bob Avery, State Police Trooper Steve Hersom and Franconia Officer Bruce McKay. The driver of the four-wheeler, Liko Kenney was stopped. Kenney had a blowgun with steel darts strapped to the four-wheeler. Officer McKay reported the stop as well as Kenney's possession of the blowgun and steel darts to the Grafton County Attorney's Office as a potential violation of Kenney's bail conditions. This led to a revocation of Kenney's bail.

On January 8, 2007, Liko Kenney contacted the State Police (Troop F) to report the theft of his Highpoint .45 caliber handgun. Kenney reported that the gun had been stolen on January 4, 2007, and that he suspected that a juvenile male relative had stolen the gun. State Police Sergeant Bret Beausoleil investigated the theft and determined that two male juveniles had entered Kenney's home and taken a DVD movie and the gun. Sgt. Beausoleil spoke to the two juveniles and confirmed that the theft had taken place. He also learned that Kenney had gone to speak to one of the juveniles about the theft and that Kenney had assaulted the juvenile in the process. Kenney had also threatened to

30

break the juvenile's legs if the police did not get to the bottom of the matter.  On January 11, 2007, Kenney told Sgt. Beausoleil that his firearm had been returned.  Sgt. Beausoleil asked Kenney about assaulting and threatening the male juvenile.  Kenney said that he had, "Shook him up a bit and told him that he'd better get the gun back or he was going to get hurt."  Kenney was subsequently charged and after a trial in the Littleton District Court, he was convicted of simple assault (for having grabbed the juvenile around neck and choking him) on April 24, 2007.  Prior to the trial, Sgt. Beausoleil learned that Kenney had engaged in potential witness tampering; that being, he attempted to try and encourage the witnesses not to appear at his trial.  This included a threat by Kenney that if he had to go to jail for simple assault he would kill the male juvenile and his grandmother when he was released.

On March 30, 2007, State Police Trooper Brian Doyle investigated a reckless conduct incident involving Liko Kenney.  Richard and Donna Larcom had reported that they had been walking their dogs on Paine Road in Easton, New Hampshire when they saw a car speeding in their direction.  The car had been traveling on the shoulder of the road and spraying dirt and water from the puddles.  The driver, Liko Kenney, had leaned into the passenger side of the car and had made an obscene gesture at the Larcoms.  The Larcoms said that the car had swerved away from them at the last second, with about a foot to spare.  The car had continued down to the end of the road, and then came back, driving in the wrong lane.  The car had slowed down at the end of the Larcoms' driveway and Kenney then made another obscene gesture, yelled out the window, "F_ _ _ you-you worthless piece of sh_ _," and drove off.  Kenney was later contacted about the incident

and confirmed that he usually did make obscene gestures at Mr. Larcom when he saw

him but denied being the one who drove by the Larcoms on March 30, 2007.

On April 25, 2007, Franconia Corporal Bruce McKay posted an "Officer Safety

Notice" in the Franconia Police Department.  The notice advised police officers regarding

Liko Kenney's recent court appearance and that Kenney, "Is known to own a .45 cal semi

auto hand gun and a blow gun with steel shafted darts."  This notice was similar to one

distributed by the State Police after Kenney's April 24, 2007 trial, and which cautioned

officers regarding encounters with Kenney.

### G.   Liko Kenney's Demeanor in the Time Prior to the May 11, 2007 Incident

**1. Dave Clark** was interviewed in June 10, 2007.  Clark works with Liko

Kenney's aunt and said that Kenney was like a younger brother to him.

Clark said that about a month and a half before the May 11, 2007 incident,

Kenney's parents were away.  Kenney apparently said something that made his parents

think he was suicidal because his father called his aunt about the concern.  The aunt

approached Clark and asked him if he would go out to the Kenney residence to check on

Liko because his parents feared he might be suicidal.  Clark left work and went to the

Kenney residence and looked for Liko who was not at the residence.  He left and drove

along Route 116 where he met Kenney along the way.  Clark asked Kenney how he was

and Kenney told him that he had been having a bad day.  He told Kenney that everyone

thought he was going to kill himself and Kenney said he would never do something like

that.  The two then went back to the Kenney residence where Clark spent four or five hours with Kenney.  He did not believe that Kenney was genuinely suicidal that day.

Clark mentioned that Kenney had anxiety and anger about his interactions with the police and the judicial system.  In particular, Kenney seemed upset about the fact that he was being charged with assault for having physical contact with the male youth who had stolen his handgun.  Clark said that while Kenney understood he had committed an assault, it seemed to Kenney that he was being demonized when he had himself been the victim of a more serious crime.  Clark also said that Kenney would rant about Cpl. McKay, saying that Cpl. McKay was crazy and that Cpl. McKay made Kenney crazy. Kenney also expressed that he was not pleased with (State Police) Sergeant Beausoleil, who was bringing the assault charge against him.

Clark characterized Kenney as eccentric and explained that small things would bother Kenney even though they may have been insignificant to others.

**2.  <u>Matthew Chernicki</u>** was interviewed on June 9, 2007.  He was a close friend of Liko Kenney and was the one who sold Kenney the .45 caliber pistol used in the May 11, 2007 incident.

Chernicki described Kenney as a friend who would do anything for him and would give the shirt off his back to someone in need.  He also described Kenney as a "sociopath" who was going to snap.  Chernicki said that he had known Kenney since they were very young and there was a joke amongst his friends that if you went, "On a hike with Liko, you never knew if you were coming back."  He said that Kenney was someone who needed mental health counseling because he was unstable.  Chernicki did not believe

33

that Kenney was suicidal.  Chernicki also said that Kenney was starting to distrust him because he was a firefighter, which Kenney viewed as some type of authority.

Chernicki stated that Kenney believed that Cpl. McKay was responsible every time Kenney was arrested by or investigated by the police.  He said that Kenney hated and even feared Cpl. McKay, but respected other officers.  He also stated that Kenney would become angry at the mere sight of a Franconia police cruiser.

Chernicki described Kenney's April 24, 2007 conviction, as the turning point where Kenney stopped trusting people and seemed to disassociate himself from others.

**3. <u>Chris Fowler</u>** was interviewed on May 12, 2007.  He is a part-time Franconia police officer and an attendant at the Franconia Transfer Station.  He reported that Liko Kenney had been at the transfer station a few weeks prior to May 11, 2007, and had said that he was going to take things into his "own hands."  Kenney mentioned that he disliked the Franconia Police Department and Cpl. McKay in particular.  Fowler also stated that Kenney had mental health and drug issues.

**4. <u>John "Bill" Kenney</u>** was interviewed on May 23, 2007. Kenney said that he did not have a good relationship with his nephew, Liko Kenney.  The two had become estranged over the years and had not had much contact prior to Liko's death.

He said that Liko had two personalities, one was normal and the other was paranoid.  He was not sure why, but he believed that Liko lived in fear.

On May 12, 2007, he went to Liko's home to look around.  While there, he observed a day planner with the words, "my last days" written in it.  He did not know when the entry had been made or why it had been made.

34

**5. <u>Don Merrill</u>** was interviewed on May 14, 2007.  Liko Kenney had worked for him at his store for approximately three weeks prior to the May 11, 2007 incident. Merrill said Kenney had been in a good mood on May 11, 2007, and had been "upbeat" that day.

Merrill said that Kenney told him that he was harassed on a regular basis.  Merrill was not sure if Kenney had mentioned Cpl. McKay.  Kenney had complained that other kids were following him to and from work.  Merrill said he had heard this from other people too.  He said that Kenney was afraid, not paranoid, when he went home.  Kenney was also irritated that people would not let him alone.  Merrill said that Kenney would not go to bars because he would get into a fight with "local boys."

**6. <u>Suzanne Merrill</u>** was interviewed on May 14, 2007.  Liko Kenney had worked at her store in Littleton.  She said that Kenney told her that he was tired of being harassed and that he was being followed home from work every day.  Merrill mentioned an incident Kenney had told her about where he was driving with Caleb Macaulay and someone was following them.  She was not sure if the person was a police officer or not.

Merrill said that Kenney had told her he was saving money to move away so he would not be harassed anymore.  He never told her who was harassing him or why he was being harassed.  Merrill said that Kenney had always been happy at work.

**7. <u>Liko Kenney's Parents.</u>**  State Police Sergeant Charles West made several attempts to contact Kenney's parents to obtain background information regarding their son and to gather information pertinent to the investigation.  The last time Sgt. West spoke to Mr. Kenney, he referred Sgt. West to his attorney.  A phone call was placed to

35

that attorney and a letter was sent to the attorney via facsimile, requesting an opportunity to speak with Mr. and Mrs. Kenney.  On June 15, 2007, that request was again extended (in-person) to the attorney.

As of the date of this report, Mr. and Mrs. Kenney have not met with the State's investigators.

**8  Sam Stephenson** was interviewed on May 12, 2007.  He witnessed some of the events at the scene.

Stephenson said he talked to Connie who had just talked to, "Norma Jean that ran the flower shop."  Connie told him that Kenney was angry with and hated State Police Sergeant Brett Beausoleil and Beausoleil's son.  He also said that Kenney had told him about two weeks earlier that he was mad.  However, Stephenson stated that Kenney had been working at Agway for two or three weeks and that Kenney had been the happiest he had ever seen Kenney.

According to Stephenson, he had grown up with Kenney.  He said that Kenney had had a hot temper.  In fact, his wife had told him that her mother had told her that Kenney had tried to run down the principal two days prior to the May 11, 2007, incident.

## H.    Gregory W. Floyd's Prior Encounters With Law Enforcement

In May of 1997, Easton Police Chief Robert Every received a complaint of weapons being fired at the Gregory W. Floyd residence in Easton, New Hampshire. Based on what was heard, it was believed that the weapons being used were automatic weapons.  A search warrant was obtained for the Floyd property and executed on May

36

19, 1997.  During that search, firearms were seized.  None of the firearms were automatic weapons.

In May and June of 1997, the Easton Police Department and New Hampshire State Police investigated a criminal threatening complaint against Gregory W. Floyd.  The complaint stemmed from an incident on May 20, 1997, where Floyd had an interaction with a man reading a utility meter on his property.  Floyd threatened the man with his dog, with physical assault and with threatening statements referring to a gun.  On June 10, 1997, State troopers went to Floyd's home to arrest him on a criminal threatening charge for this incident.  Floyd was combative, abusive and threatening with the troopers. He was charged for attempting to knee a State trooper in the groin.  Floyd was arrested on that charge and was found guilty of attempted simple assault (misdemeanor) on June 22, 1998, in the Grafton County Superior Court.  He was given a suspended State prison sentence and three years probation.

During the 1997 incidents, the State Police also learned that Floyd had two felony drug convictions in the State of Georgia in 1981.  For these crimes he had been sentenced to a term of probation.  On June 24, 1997, the State Police went to Floyd's residence to arrest him on a warrant for being a felon in possession of firearms.  A search warrant was also executed during that arrest and several firearms were seized.  Those charges were eventually dismissed by the Grafton County Attorney's Office because they determined they did not meet the legal standards necessary to support the prosecution under New Hampshire law.

### III.   LEGAL ANALYSIS

#### A.   The Applicable Law Regarding the Use of Force

RSA 627:5, I provides that "[a] law enforcement officer is justified in using non-deadly force upon another person when and to the extent that he reasonably believes it necessary to effect an arrest or detention or to prevent the escape from custody of an arrested or detained person...."  The term "[n]on-deadly force means any assault or confinement which does not constitute deadly force."  RSA 627:9, IV.

New Hampshire law also permits the use of deadly force in certain defined circumstances.  See RSA 627:4 and 627:5.  In pertinent part, RSA 627:4, II(a) permits an actor who is not a law enforcement officer to use deadly force when the actor reasonably believes that another person is about to use unlawful deadly force against the actor or a third person.  The phrase "reasonably believes" means that the actor "need not have been confronted with actual deadly peril, as long as he could reasonably believe the danger to be real."  State v. Gorham, 120 N.H. 162, 163-64 (1980).  The term "reasonable" "is determined by an objective standard."  State v. Leaf, 137 N.H. 97, 99 (1993).  That means that in deciding whether a person acted in self-defense, all the circumstances surrounding the incident should be considered, Aldrich v. Wright, 53 N.H. 398 (1873), and the actor's conduct should be viewed "under the circumstances as they were presented to him at the time, and not necessarily as they appear upon detached reflection."  N.H. Criminal Jury Instructions, 3.10.  "A person is not justified in using deadly force on another to defend himself or a third person from deadly force by the other

if he knows that he and the third person can, with complete safety [r]etreat from the

encounter...." RSA 627:4, III(a).

> The phrase "deadly force" is defined by RSA 627:9, II as:

> [A]ny assault or confinement which the actor commits with the purpose of causing
> or which he knows to create a substantial risk of causing death or serious bodily
> injury. Purposefully firing a firearm capable of causing serious bodily injury or
> death in the direction of another person or at a vehicle in which another is believed
> to be constitutes deadly force.

Depending on the manner in which it is used, a motor vehicle can also constitute a

"deadly weapon." See State v. Hull, 149 N.H. 706, 714-15 (2003).

### B.      The Attempt to Take Liko Kenney Into Custody and the Shooting and Vehicular Assault of Corporal McKay

Cpl. McKay used non-deadly force to attempt to detain and arrest Liko Kenney on

May 11, 2007. That non-deadly force included: pursuing Kenney after he fled from Cpl.

McKay during the initial roadside stop; passing Kenney and blocking his car from

proceeding on Rte. 116 during the pursuit; pushing Kenney's car back onto the dirt

driveway after Kenney attempted to flee a second time; and using OC spray on Kenney in

the dirt driveway. Based on the circumstances as they appeared on May 11, 2007, and in

light of Kenney's prior conduct during the January 2003 incident, all of the actions by

Cpl. McKay constituted a reasonable use of non-deadly physical force by a law

enforcement officer in accordance with RSA 627:5, I.

Liko Kenney used deadly force when he shot Cpl. McKay four times with a

firearm and then twice struck him with his car. At the time Kenney committed these acts,

neither Kenney nor Caleb Macaulay had been confronted with the imminent use of

39

deadly force.  In addition, under the circumstances as they were presented to Kenney at the time, no person would have reasonably believed that it was necessary to use deadly force against Cpl. McKay.  Therefore, Liko Kenney's use of deadly physical force against Cpl. McKay was not justified in accordance with RSA 627:4, II.

### C.    The Shooting of Liko Kenney

Under New Hampshire law, Gregory W. Floyd used deadly force when he shot Liko Kenney twice with a firearm.  Based on all the facts and circumstances of this particular incident, that use of force was legally justified.

At the time Floyd went to help Cpl. McKay, it was reasonable for him to conclude that there was still a threat to his life and Cpl. McKay's life because Kenney was still in possession of two deadly weapons (a firearm and a car) and Kenney was continuing to demonstrate his intent to use each of the deadly weapons.  Kenney had not disposed of his .45 caliber gun after shooting Cpl. McKay and instead, had reloaded the gun in order to again make it ready to fire.  This was confirmed by the fact that an empty clip was found in Kenney's car on the driver's side floor and the gun was found loaded with a new clip in it when it was recovered at the scene.  Floyd also said that before he shot Kenney, he saw Kenney holding the gun with both hands down near his lap and that the gun was pointed toward the passenger door of the car (where Floyd was standing).  Floyd stated that it appeared to him that the gun was jammed and that Kenney was manipulating the gun in an attempt to clear the jam.  Even though Floyd told Kenney to stop trying to reload his gun and drop the weapon, Kenney looked at Floyd, ignored him and continued to try to make the gun ready to fire.  Floyd's son heard his father tell Kenney not to

reload the gun and had seen Kenney with the gun out the window as he tried to run down his father and Cpl. McKay.

In addition, when Floyd attempted to help Cpl. McKay, Kenney was still at the wheel of his car and had showed no signs of abandoning his attempts to run down Floyd and/or Cpl. McKay. Floyd had witnessed Cpl. McKay try to get away from Kenney and watched Kenney pursue Cpl. McKay across the road and then up onto the lawn across the road. He also saw Kenney back up and pursue Cpl. McKay again and eventually strike Cpl. McKay with his car. Based on the observations of Kenney's manner of use of his car, the car was certainly a deadly weapon at the time of the incident.

In light of all of Kenney's actions, it was reasonable for Gregory W. Floyd to conclude that Kenney was going to continue using deadly force (through the use of his gun and/or car) on Cpl. McKay and possibly Floyd himself as well. In addition, under the circumstances, it was reasonable for Floyd to conclude that he and Cpl. McKay could not safely retreat from the encounter. That conclusion is supported by the fact that: Cpl. McKay had already tried to retreat from the encounter; Kenney had shot Cpl. McKay as he retreated; Kenney had pursued Cpl. McKay across the road in his car while still in possession of his firearm; Kenney had run over Cpl. McKay; and Cpl. McKay was pinned under Kenney's car. Given those facts, it was reasonable for Floyd to conclude that he and Cpl. McKay could not safely retreat from the encounter with Kenney.

### D.  Gregory W. Floyd's Possession of Firearms

RSA 159:3 prohibits persons who have been convicted of certain specified felonies from possessing or having under their control several types of deadly weapons, including firearms.  During the May 11, 2007 incident, Gregory W. Floyd possessed two firearms after having been convicted of two felonies in the State of Georgia.  Assuming that Floyd's felony convictions meet the criteria set forth in RSA 159:3, he could potentially be charged with a crime for having had possessed two firearms on May 11, 2007, in violation of RSA 159:3.

In New Hampshire, conduct, which might otherwise constitute a crime, may be justified under appropriate circumstances by the defense of competing harms.  RSA 627:3, I establishes that:

> Conduct which the actor believes to be necessary to avoid harm to himself or another is justified if the desirability and urgency of avoiding such harm outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the statute defining the offense charged.

The competing harms statute "essentially codifies the common-law defense of necessity." State v. Fee, 126 N.H. 78, 80 (1985).  That means that "[a]n individual is protected from prosecution under the competing harms defense if he commits a criminal act that was urgently necessary to avoid a clear and imminent danger." Id. (citation and quotation marks omitted).  Floyd's actions meet this standard.

Floyd was unarmed at the time he witnessed Liko Kenney shoot Cpl. McKay and then strike Cpl. McKay with his vehicle.  Floyd left the safety of his truck to help Cpl. McKay and armed himself with the fallen officer's gun in order to protect himself and/or

42

Cpl. McKay. Given all the facts and circumstances as they were presented to Floyd on May 11, 2007, including what Floyd had witnessed Kenney inflict on Cpl. McKay; Floyd's actions were urgently necessary to avoid a clear and imminent danger posed by Kenney. Therefore, even if Gregory W. Floyd's prior felony convictions met the requirements of New Hampshire law under RSA 159:3, his actions in possessing the firearms were legally justified in accordance with RSA 627:3.

## IV.    CONCLUSION

Based on a careful examination of the circumstances surrounding the May 11, 2007 incident, as detailed in this report, the Attorney General has concluded that Liko Kenney used unlawful deadly force by shooting Franconia Police Corporal Bruce McKay four times and then striking him with his car. Gregory W. Floyd witnessed those events and responded to Kenney's actual use of deadly force and the continued threat of deadly force posed by Kenney by shooting Kenney twice with Cpl. McKay's firearm. Accordingly, the Attorney General has concluded that under the circumstances as Gregory W. Floyd knew them at the time, his use of deadly force was lawfully justified pursuant to RSA 627:4, II(a). Therefore, no criminal charges will be brought in connection with Gregory W. Floyd's legally justified actions in Franconia on May 11, 2007.

[194625]